Scott-Mayer Commission Company v. Merchants' Grocer Company.

Opinion delivered January 17, 1921.

1. BAILMENT—PLACE OF STORAGE.—Where a bailee expressly contracts to keep property in a particular place, he will be liable for his failure to do so, although at the time the property was received the bailee, by force of circumstances, was compelled to store the property in another place, and in doing so was not guilty of any negligence.

2. BAILMENT—CONTRACT TO STORE GOODS.—Where a bailee agreed simply to store a carload of potatoes, without special or express contract to keep the same in any particular plant or building, he is bound only to exercise reasonable care and diligence to preserve the property intrusted to him, and is not an insurer nor liable for conversion in case the potatoes are lost without negligence on his part.

3. BAILMENT—QUESTION FOR THE JURY.—In an action against a bailee for goods stored by him in a different cold storage plant from the one intended, evidence *held* to require the submission to the jury of the issue whether the bailee specially contracted to store the goods in a particular cold storage plant.

4. BAILMENT—QUESTION FOR THE JURY.—In an action against a bailee for loss of goods, evidence *held* to require submission to the jury of the issue whether the bailor had ratified a change in the place of storage if the jury found a special contract to store in a particular cold storage plant.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge; reversed.

*Owens & Ehrman,* for appellants.

1.   The court erred in directing a verdict for appellee, as there is a direct conflict in the evidence on two ma-

terial points and a case was made for a jury.  83 Ark. 631; 97 *Id.* 643; 107 *Id.* 158; 120 *Id.* 446; 128 *Id.* 347.

Appellate courts, where a verdict has been instructed, view the evidence in the most favorable light to the party against whom the instruction is given, and if there is any evidence justifying a verdict in his favor, they will remand for a new trial.  73 Ark. 561; 89 *Id.* 368; 92 *Id.* 618; 96 *Id.* 394; 105 *Id.* 136; 115 *Id.* 166; 124 *Id.* 460; 136 *Id.* 128.  The trial court adopted the view of the rule stated in 3 C. L. 118, which was error.  The theory of appellee that appellants were bailees of the potatoes, but there is a direct conflict in the evidence as to the intention of the parties.

Before a bailee can be held guilty of conversion, the bailor must prove the exercise by the bailee of control over the property inconsistent with his title.  2 Cooley on Torts 872; 163 S. W. 381; 103 S. E. 36.  The uncontroverted evidence is that the potatoes were stored at the National Company in the name of the Merchants' Grocer Company, the appellee, and the warehouse receipt introduced in evidence and identified by appellee's manager as the one received from the National Company states on its face that the goods were received in storage for the Merchants' Grocer Company.

There is no distinction between the liability of a warehouseman and a bailee for hire.  A warehouseman is bound only to exercise an ordinary care in the preservation of goods entrusted to him.  He is not an insurer and is not responsible for loss unless occasioned by his fault or negligence.  Mohun on Warehousemen 51; 42 Ark. 200; 63 *Id.* 344.

2.  Appellants were not guilty of any negligence in sending the potatoes to the National Warehouse.  The potatoes were perishable, and O'Leary acted in good faith and handled the potatoes as he would have handled similar commodities belonging to himself.  All this occurred during March, 1918, when war was on, and the utmost efforts were being made to conserve food supplies.  The

courts should take judicial knowledge of the rules and regulations of the United States Food Administration, and dealers were required to handle and preserve all perishable foodstuffs.   258 Fed. 307; 152 U. S. 211; act August 10, 1917, §§ 1, 5, etc.   General License Regulations. 1 A, rule 11.

Appellants were duly licensed and acting under a license from the United States Food Administration, and the court should take judicial notice that O'Leary was compelled to place the potatoes in cold storage, and, there being no room in the Arkansas warehouse, the compulsion on him to place them elsewhere was absolute, and, doing so, was a valid defense to this action.

Under the evidence and facts the trial court would have been justified in directing a verdict for appellants. 180 S. W. 1000.   It is always competent for a bailee or warehouseman to prove that the bailed property was taken from him under valid, legal process, and that is a complete defense to an action by a bailor for conversion. Appellee had full and complete notice, and by silence and acquiescence has ratified the action of O'Leary and is estopped.   This case differs from the Massachusetts case and those in 123 Mo. App. 582, 100 S. W. 538 and 52 Mo. App. 323.   See 162 N. Y. 900.

3.   In a suit against a bailee for conversion the burden of proof is on the bailor to prove negligence.   The bailee by proving delivery of the bailed property and the failure to redeliver on demand makes out a *prima facie* case and casts the burden of going forward with the evidence on the bailee, but, when the bailee shows that the goods have been lost, stolen or destroyed, the bailor must affirmatively prove that the bailee has been guilty of some fault or negligence in the preservation of the bailed property.   Story on Bailments, § 410; 68 Ark. 284.   It was error to direct a verdict.

The cases in 74 Ark. 557 and 55 *Id.* 240, are not similar to this, and not in point.

*Brundidge & Neelly* and *W. H. Rector,* for appellee.

1. Upon the undisputed facts the lower court held properly as matter of law that the act of defendant in sending the potatoes to the National Company, when they had contracted to store them with the Arkansas Company was a breach of their contract and rendered them liable. A bailee who makes a contract to store a chattel at a special place is liable for any loss or damage accruing by reason of his storing the chattel at some other place. 68 S. W. 496; 24 L. R. A. (N. S.) 1117; 94 Minn. 326; 3 A. & E. Ann. Cas. 468. See, also, 97 Mo. App. 253. The rule stated in 3 R. C. L. 118 is well supported. See L. R. Q. B. Div. 510; 109 Am. St. 679; 98 Am. Dec. 516; 6 Cal. 643; 13 Ala. 587; 99 N. E. 181; 38 Wis. 603; Schouler on Bailments, § 106; Piggott on Torts, § 353; 30 A. & E. Enc. Law 53.

2. There is no evidence from which a jury could infer ratification. Elliott on Cont., § 455. Defendants are liable under a contract which they breached, and no ratification is proved or even knowledge of the material facts. Plaintiff had no knowledge of the material facts, and hence there could be no ratification, and plaintiff is not bound. 55 Ark. 240; 74 *Id.* 557; 64 *Id.* 217; 76 *Id.* 563; 124 *Id.* 360. There being no evidence whatever to show a ratification of the unauthorized change in the place of storage or to show that plaintiff had released defendants from the contract, and all the facts tending to show the contrary, the court properly directed a verdict for plaintiff. The court's instruction was proper, and the verdict is in accordance with the undisputed facts.

WOOD, J. The Merchants' Grocer Company, the appellee, was a corporation in the wholesale grocery business at Searcy, White County, Arkansas. Henry Patterson was its secretary and manager. The Arkansas Cold Storage Company was engaged in the cold storage business in Little Rock, Arkansas, under the management of W. A. O'Leary.

Patterson testified that on March 19, 1918, he called up O'Leary over the telephone and asked him if he had space in the Arkansas Cold Storage Company (hereafter called Arkansas) for a car load of potatoes. O'Leary said that he did. Witness asked what he would charge, and O'Leary replied, "35 cents a sack." Witness told him that he had a car on the track and would ship them right away, and O'Leary replied, "All right." The same day witness took out the bill of lading and shipped the car to the Arkansas. Witness had previously at different times done business with the Arkansas, and for that reason wanted to store the potatoes with that company. O'Leary told witness that he was the manager of the Arkansas, and would store the potatoes and to send them on. The appellee never authorized O'Leary, or any one else, to deliver the car of potatoes to the National Ice and Cold Storage Company (hereafter called the National), or to any one else. Witness afterward demanded the potatoes of O'Leary, and he informed witness that he had sent them to the National. Witness, upon inquiry, found that the potatoes had been dumped. He thereupon asked O'Leary if he didn't think he ought to have notified witness concerning them, and O'Leary replied, "No, he did the very best he could;" that the Food Administrator took them; that was the first that witness knew that the Arkansas did not have the potatoes. O'Leary did not at any time claim to witness that witness had authorized him (O'Leary) to divert the potatoes from the Arkansas to the National. Witness received a bill of .50 cents a sack from the National for storage. There were 200 sacks and the amount was for $100. Witness called up O'Leary, and said to him that he had made a contract with witness for 35 cents a sack, whereupon O'Leary told witness to remit for 35 cents a sack. The market price of potatoes on the day witness made demand upon O'Leary for them was $3.20 a hundred pounds. There were 30,000 pounds, and the total amount of appellee's damage was $960. The National sent its receipt to appellee for the potatoes, dated

March 30, 1918. This receipt showed that the potatoes were received in storage by the National for the account of the appellee. Witness did not know at the time that the National was a separate cold storage company; he found that out later when he went to see them. If witness had taken the time to read the receipt, he would have known that the potatoes were in the other warehouse, but he didn't pay any attention to it. Witness' company was well stocked with potatoes. Planting time was over then. Witness thought that about the time the potatoes were shipped a copy of the bill of lading was sent to O'Leary.

O'Leary testified that in the spring of 1918 Patterson called witness up and asked witness if he could take care of the potatoes in controversy. Witness told him that he couldn't take care of them himself, but that the Arkansas could. Patterson asked what the charges would be and witness replied, "Thirty-five cents." Patterson then said, "I have a car load on track, and if I can't get rid of them I might ship them down." Witness inquired of Patterson, "When are you going to let them come," and he said, "I don't know—I will let you know when I do ship right away." That was the last witness heard of it until the warehouseman called witness up and said there was a car load of seed potatoes there and wanted to know what to do with them. Witness asked where they were from, and the warehouseman answered that he didn't know. Witness told him to call up the railroad company and find out. Later the warehouseman called witness and said that the potatoes were from Searcy. Witness then told the warehouseman to go ahead and unload them, and he said he couldn't; that the house had been filled three or four days prior to that. The Food Administrator got on to it in some way and called witness up. Witness told the Food Administrator that he would take care of it, but witness couldn't take care of it at the Arkansas. Witness was storing some of his own goods at the National. The warehouseman said he could not take care of the car, and witness felt that it

was his duty to place them somewhere to be taken care of, so he ordered it to the National, and the warehouse receipt was issued and sent to Patterson. They charged the regular rate of 50 cents a sack, and Patterson called witness up and said, "You made me a rate of 35 cents." Witness replied, "I did, but that was at the Arkansas." Witness then told Patterson that he would see the National and ask it to meet that rate for him. Witness called up the National and explained that Patterson was a friend of his and wanted it to take care of him at the rate witness had made. The National agreed to do so, and Patterson sent it the storage charges of $70, that is, 35 cents a sack. In the first conversation in regard to witness storing the potatoes, Patterson said that he was long on Triumphs. Witness said, "You are in the same boat as everybody else." Patterson then said: "If I can't dispose of them for eating potatoes, I will ship them down to you." Witness replied, "All right, let me know." Witness heard nothing further after that until eight or nine days when the warehouseman called witness up. If Patterson had notified witness definitely that he was shipping the potatoes on the day he called witness up, witness would have taken care of it. If witness had known that the car was coming, he could have cut out a car of near beer that came in just at the last minute and taken care of appellee's car instead. Witness didn't expect the car at the time same arrived. When witness informed Patterson that he had sent the car to the National, Patterson raised no objection. He remarked that he had the National receipt calling for $100 and reminded witness that the arrangement was that he was to pay $70, whereupon witness promised, and did arrange with the National for that rate. At the time witness had the conversation with Patterson in regard to storing the potatoes, witness was one of the lessees of the Arkansas and Scott-Mayer was the other. The plant was being operated under the name of the Arkansas Cold Storage Company. Patterson did not ask witness about storing the potatoes with the

Arkansas, but simply asked witness if he could take care of a car load of potatoes, and witness told him that he could not at his individual plant, but thought he could at the Arkansas.  Witness had no authority or permission from Patterson to store the potatoes at the National, but did it on his own initiative.  Witness did not tell Patterson at the time they had the conversation in regard to the rate charged by the National that the National was a separate and distinct concern from the Arkansas.  Witness told Patterson that he would take it up with the National and explain the circumstances and ask if the National would not reduce the price.  At that time witness didn't know whether Paterson knew it was a different concern or not.  Patterson had the warehouse receipt showing it.

A letter, dated April 11, 1918, from the National to the appellee, enclosing to the latter the warehouse receipt covering the potatoes in controversy and storage charges for $100, was introduced in evidence.  In this letter nothing was said about O'Leary or the Arkansas. Another letter from the National to the appellee dated April 13, 1918, reads as follows:  "We are in receipt of your notation on our invoice of the 1st, relative to our storage charge of 50 cents per sack per season, and stating that Mr. O'Leary quoted you a price of 35 cents.  In this connection we beg to advise you that while 50 cents is our regular rate, inasmuch as Mr. O'Leary quoted you 35 cents, we are crediting your account with the difference of $30, but wish to state that we can not handle any more at this rate."

Witness Sullivan testified that he was foreman at the warehouse of the Arkansas; that the car of potatoes arrived on March 25, 1918, and that the Arkansas did not have room for it and did not know that the car was coming on that day until it got there; that the car was ordered out by O'Leary to the National.  Patterson wrote to the Arkansas, enclosing an invoice for the car of potatoes in controversy.  In answer to this a letter dated August 12, 1918, from O'Leary

to the appellee was introduced, in which he stated in explanation of the disposition of the car that his company had sent the car on with some of its own and others to the National; that the Arkansas had done the best it could to have the potatoes taken care of and put under refrigeration as quickly as they arrived. The letter then explains the reason why they were lost, and disclaimed liability, and returned to the appellee its invoice.

This action was instituted by the appellee against the appellants, Arkansas Cold Storage Company and others, to recover damages for the loss of the potatoes, alleging that the same were lost through the negligence of the Arkansas Cold Storage Company and the other appellants, its lessees, in diverting the potatoes to the National. The appellants denied all material allegations of the complaint.

The above are the issues and the facts developed by the testimony, upon which the trial court, over the objection of appellants, directed the jury to return a verdict in favor of the appellee, to which ruling of the court appellants duly excepted. The appellants then presented prayers for instructions directing the jury to return a verdict in their favor, asking the court to submit the issue of the alleged negligence of the appellant to the jury, and also as to whether or not the appellee by its conduct had not ratified the acts of the Arkansas in storing the car of potatoes with the National. The court refused these prayers, to which appellee duly excepted. The jury returned a verdict in favor of the appellee in the sum of $960. Judgment was rendered for appellee in that amount, from which is this appeal.

Two questions are presented:

1. Does the undisputed testimony show that the appellant, the Arkansas, as bailee for hire of the car of potatoes in controversy, violated its contract with the appellee, the bailor, for storage? It is undoubtedly the law that where a bailee expressly contracts to keep property in a particular place he will be liable for his fail-

ure to do so, although at the time the property was received the bailee, by force of the circumstances, was compelled to store the same in another place, and in doing so was not guilty of any negligence. For the bailor and bailee would be bound by the terms of any special contract of that sort made between them. If, therefore, the undisputed testimony shows that the Arkansas undertook for hire to store the car of potatoes in its own building and nowhere else, then it could not escape liability on the ground that at the time the car of potatoes was received its own storage plant was full, and that, in order to preserve the potatoes, it was compelled to store the same with another storage plant without the knowledge or consent of the appellee. This is the law as shown by *McCurdy* v. *Wallblom Furniture & Carpet Co.*, 94 Minn. 326, 3 A. & E. Ann. Cas. 468, and cases cited in note; *Locke* v. *Wiley*, 24 L. R. A. (N. S.) 1117; *Butler* v. *Greene*, 49 Neb. 280, 68 S. W. 496; *Hudson* v. *Columbian Transfer Co.*, 137 Mich. 255, 109 Am. St. Rep. 679; *Mortimer* v. *Otto*, 126 N. Y. Sup. 866; *Kennedy* v. *Portman*, 97 Mo. App. 253; Schouler on Bailments, § 106; 2 Cooley on Torts, 1332; 30 Am. & Eng. Enc. of Law 53, and other authorities cited in appellee's brief.

On the other hand, if the contract between the Arkansas and the appellee was that of bailment for hire, and the contract contemplated that the Arkansas as the bailee should keep the car of potatoes for the appellee in cold storage, but without any special or express contract to keep the same in any particular plant or building, then the liability of the Arkansas to the appellee was that of a warehouseman engaged in, and equipped for, the storage of goods of that character. If, under the contract, such was the relation between the Arkansas and the appellee, then the duty of the former was to exercise reasonable care and diligence to preserve the property intrusted to it, that is such care as an ordinarily prudent person engaged in that particular business would or should have exercised for the preservation of the po-

tatoes.   If such were the relation, the Arkansas was not
an insurer and thereby liable absolutely for the loss
of the potatoes, but was only responsible for loss caused
by its negligence.   Nor was it liable as for conver-
sion, which always implies that the bailee has dealt
with the property wholly inconsistent with the contract
under which he holds same.   *Burr & Co.* v. *Dougherty,*
21 Ark. 559-566; *Murphy* v. *LeMay,* 32 Ark. 223, 225; *L.
R. & Fort Smith R. Co.* v. *Hunter,* 42 Ark. 200.   See,
also, *Union Compress Co.* v. *Nunnelly,* 67 Ark. 284; Mo-
hun on Warehousemen, 51; 3 R. C. L., § 39; 30 A. & E.
Enc. Law, 46; Schouler on Bailment and Carriers, 101;
*Locke* v. *Wiley, supra,* case note; *Bradley* v. *Cunningham,*
61 Conn. 485.

Under the above principles of law, the court should
have submitted to the jury the issue, first, as to whether
or not the relation of bailor and bailee existed between
the appellee and the Arkansas, and, second, if they found
that such was the case, then the court should have sub-
mitted the issue as to whether or not the contract of
bailment contemplated that the car of potatoes should
be stored by the Arkansas in its own particular plant
or building.   Without going into detail in discussing
the testimony, it suffices to say that these were issues
of fact under the evidence for the jury to determine,
guided by the principles above announced.

2.   Does the undisputed testimony show ratifica-
tion by the appellee of the act of the Arkansas in stor-
ing the potatoes with the National?   It occurs to us
also that, if a contract of bailment existed between the
Arkansas and the appellee, and if the Arkansas violated
that contract by storing the goods with the National, then
it was a question for the jury to determine, under all the
evidence, as to whether or not the appellee had knowl-
edge of the fact that the potatoes had been so stored,
and, if it had such knowledge, whether or not it had by its
conduct ratified the act of the Arkansas in storing the
potatoes with the National.   In directing the verdict in

favor of the appellee, the court took these issues from the
jury.   This was error for which the judgment must be
reversed and the cause remanded for a new trial.